IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs September 16, 2014

**CONLEY R. FAIR v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Unicoi County**
**No. 6385   Stacy L. Street, Judge**

**No. E2014-00406-CCA-R3-PC - Fileed October 31, 2014**

The Petitioner, Conley R. Fair, appeals the Unicoi County Criminal Court's denial of his petition for post-conviction relief from his 1997 convictions for first degree murder and attempted first degree murder and his life-plus-thirty-five-years sentence.  The Petitioner contends that the post-conviction court erred by (1) denying him relief because he received the ineffective assistance of counsel and (2) failing to make findings of fact and conclusions of law regarding his claim that he was denied his right to confront witnesses.  We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROGER A. PAGE, JJ., joined.

Jeffery C. Kelly, District Public Defender; Wesley Taylor (at post-conviction hearing & on appeal), Assistant District Public Defender; and David Hall Crichton (at post-conviction hearing), Assistant District Public Defender, for the appellant, Conley R. Fair.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Senior Counsel; Anthony Wade Clark, District Attorney General; and Ryan Curtis, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises from the Petitioner's killing Bruce Stukey and attempting to kill James Brown.  The Petitioner appealed his convictions, and this court affirmed the convictions and summarized the facts of the case as follows:

By the time of trial, Mr. Brown had died of causes not related to this case. However, the jury heard an audiotape of his testimony from the defendant's preliminary hearing, and a transcript was admitted into evidence. At the preliminary hearing, Mr. Brown testified that around 6:30 p.m. on August 14, he drove Mr. Stukey to the defendant's house. He said Mr. Stukey wanted to buy a gun from the defendant, but the defendant said the gun was hidden on Fire Tower Road. He said the defendant stated that Mr. Brown's car could not make the drive and asked Mr. Stukey to come back in an hour, and the two would go to Fire Tower Road to get the gun. Mr. Brown testified that Mr. Stukey did not want to wait an hour, and they drove to Mr. Stukey's house to get Mr. Stukey's truck. He said they then picked up the defendant, and the three of them went to Fire Tower Road around 7:30 p.m.

Mr. Brown testified that Mr. Stukey had no gun or other weapon and that he would have been able to tell if Mr. Stukey had a weapon underneath his clothing. He said the defendant directed Mr. Stukey to Fire Tower Road and had Mr. Stukey pull off the main road near a trail. He said they all got out of the truck and started walking down the trail. He said the defendant led the way, followed by Mr. Stukey, then himself. He said they walked through heavy woods, then veered off the trail on to a walking path. He stated that the path had lots of stickers and brush and that he stopped and told the defendant and Mr. Stukey that he would wait for them because the area was too wooded. He testified that the defendant told him to continue because they were already there.

Mr. Brown testified that he was about twenty feet from the defendant and Mr. Stukey and that as he tried to make his way down the trail toward them, he heard a loud popping noise. He said he looked up and saw the defendant coming toward him pointing a gun toward his head. He said the defendant shot the gun in his direction, then turned and shot Mr. Stukey twice in the back. He said Mr. Stukey had no weapons and had not threatened the defendant. He said Mr. Stukey fell face down, and the defendant came toward Mr. Brown again. Mr. Brown testified that the defendant looked like he had snapped, and he said he started running through the woods, away from the defendant. He said the defendant chased him through the woods and fired four or five more shots at him. He said the defendant stated, "Come here, boy."

Mr. Brown testified that he continued running but that the incline of the mountain was so steep, he fell and slid down part of the mountain. He said he ran for a long time until he no longer heard the defendant chasing him. He

said he continued walking and running through the woods but that he had hurt his leg, and it was getting dark. He said that when it became too dark to continue, he sat down and waited for morning. He testified that when it became light again, he continued walking through the woods until he found a trail that led him to a house. He said he found a man who drove him to a convenience store where he called the police. He said that a bullet had grazed his finger.

Mr. Brown testified that all three men had smoked marijuana on the way to Fire Tower Road. He said that several weeks before the shooting, Mr. Stukey had suspected the defendant of stealing money from him. Mr. Brown stated that he had been in a detoxification program for heroin three weeks before the shooting.

Troy Lewis, an officer with the Unicoi County Sheriff's Department, testified that on August 15, 1995, he was dispatched to Jerry's Market. He said that when he arrived, medical personnel were treating Mr. Brown. Officer Lewis stated that Mr. Brown had numerous scratches and a burn on his right middle finger. He said he learned that Mr. Stukey had been shot on Fire Tower Road and that Mr. Brown had spent the night getting out of the woods. Officer Lewis testified that he and Sergeant Harris went to Fire Tower Road on Buffalo Mountain and searched the area. He said they found Mr. Stukey's red truck, and they secured the scene for the Tennessee Bureau of Investigation (TBI).

Ron Arnold, a criminal investigator with the Unicoi County Sheriff's Department, testified that he was dispatched to Buffalo Mountain around 7:30 a.m. on August 15. He said that fifteen to twenty people were searching for Mr. Stukey's body, but they could not find it. He said they learned that Mr. Stukey was wearing a pager, and they decided to call it. He said they located the pager but not Mr. Stukey's body. He testified that he found a trail consisting of Mr. Brown's receipts, cigarettes, and car keys that led to a blood-stained area deep in the woods. Agent Arnold testified that he determined that this was the location of the shooting. He said he assembled a search party to search the immediate area, and Mr. Stukey's body was found about thirty minutes later, about one-quarter to one-half mile from the crime scene. He testified that the body had numerous scratches. Agent Arnold testified that the next day, he returned to the crime scene with a metal detector and found a spent bullet on the ground.

Agent Arnold testified that he learned that the defendant had gone to his sister's house in Dothan, Alabama, but was on his way back to Tennessee. He said that on August 17, he learned that the Johnson City Police Department had the defendant in custody. He said he went to Johnson City to bring the defendant to Unicoi County. Agent Arnold said the defendant was then arraigned and booked and that during the booking process, the defendant removed a piece of paper from his pocket and began to tear it up. Agent Arnold said that another Agent got the letter from the defendant, and they pieced it together. He said the letter was written and signed by the defendant. The letter was admitted into evidence, and in the letter, the defendant admitted killing Mr. Stukey and trying to kill Mr. Brown. He claimed that Mr. Stukey and Mr. Brown took him into the woods to show him a pot plant. He wrote that Mr. Brown struck him from behind, causing him to fall into Mr. Stukey and knock a gun out of Mr. Stukey's pants. The defendant wrote that he fired the gun because he feared for his life.

Agent Arnold testified that after reading the letter, they took the defendant to the emergency room to have him examined. Agent Arnold said he did not notice any injuries on the defendant nor did the defendant complain of any. He said the defendant was not treated for any injuries at the hospital. Agent Arnold testified that after interviewing the defendant's family, he went to 700 E. Maple Street in Johnson City where the defendant had been living with family members. He said he and other officers looked for a gun in the wooded area behind the street. He said they found a gun containing one bullet and a box of ammunition between 632 and 634 E. Maple Street.

Agent Arnold testified that he processed Mr. Stukey's truck for fingerprints but that none were identifiable. He said he found a marijuana pipe containing what appeared to be marijuana residue in Mr. Stukey's truck. He testified that when Mr. Stukey's body was found, it was clothed in a tank top and cotton sweat pants with an elastic stretch band. He admitted that the defendant voluntarily went to the authorities in Johnson City.

Dr. Cleland Blake, the Assistant State Chief Medical Examiner, testified that he performed an autopsy on Mr. Stukey's body on August 16. He testified that the victim died from three gunshot wounds and that he retrieved two bullets from the victim's body. He said one bullet penetrated the front of the victim's left chest, traveling in a downward trajectory and lodging above the rib bone. He said another bullet entered the back through the lower chest area, lodging in a vertebra. He said he found a third wound that entered the

back and exited in the front, just under the collarbone. He said this wound caused bleeding in the left chest cavity and penetrated the top of the lung. Dr. Blake testified that the victim lived for as much as one hour after his injuries were inflicted. He said the victim had numerous scratches and bruises. He testified that the first two wounds received were those to the back of Mr. Stukey, with the final wound inflicted at the front of the chest as Mr. Stukey was falling. He testified that the shots were fired from at least three feet away and from a steep angle.

Robert Royse, a firearms identification specialist with the TBI, testified that he examined the revolver found in the bushes, the ammunition in the adjacent box, and the bullets that were retrieved from Mr. Stukey's body and from the crime scene. He testified that the bullets from Mr. Stukey's body were fired from the revolver and were the same as the bullet found at the scene. He said the bullets in the ammunition box were also consistent with the bullets from Mr. Stukey's body and the scene.

TBI Agent Shannon Morton testified regarding the extensive search for the defendant's body. He testified that the search was treacherous because of the wooded, rugged terrain on the mountain and the steep incline. Agent Morton also testified regarding the defendant pulling out a letter and ripping it up during booking. His testimony was substantially the same as that of Agent Arnold. Agent Morton testified that the defendant had no visible injuries and made no complaint of injuries.

Diane Trivette, the defendant's sister, testified that the defendant came to her house in Dothan, Alabama, around 1:00 a.m. on August 15. She said he told her that he thought he had shot and killed someone in self-defense. She told him to turn himself in to the police. She did not see any injuries on the defendant.

Cathy Fair, the defendant's sister-in-law, testified that the defendant lived with her and her husband. She testified that the defendant had stated that he was going to get Mr. Stukey and that she told him to let the law handle the matter. She said she saw the defendant on their porch at around 2:00 a.m. on August 15 and that the defendant said, "I did it." She said she did not know what he meant, and she went inside. She said that when she came outside, the defendant said he had killed the victim. She said she remembered making a statement to Agent Morton relating what the defendant told her about that night. In her statement, she said that the defendant told her that he, Mr. Stukey

and Mr. Brown went to the mountain and walked down the trail. She said the defendant told her he asked Mr. Stukey why Mr. Stukey had asked the defendant's niece for "a piece of ass." The defendant told her that Mr. Stukey denied making the statement. She said the defendant told her that he called Mr. Stukey a "lying son-of-a-bitch" and shot him in the middle of the chest. Ms. Fair stated that the defendant told her that Mr. Stukey said he would kill the defendant and that Mr. Stukey came toward the defendant. She said the defendant told her that he then shot Mr. Stukey in the heart and that Mr. Brown ran off. She said the defendant told her that Mr. Stukey was trying to crawl away, and he shot him twice in the back.

Ms. Fair stated that the defendant told her that he went through Mr. Stukey's pockets and took sixty dollars, cigarettes, and a lighter. She said the defendant told her that he talked to Mr. Stukey as he was dying and that Mr. Stukey asked the defendant why he shot him and told the defendant that he loved him. She said the defendant told her that he told Mr. Stukey that "no one f***s with my family" and lives.

At trial, Ms. Fair testified that before the defendant left to go with Mr. Stukey on the night of the murder, she knew the defendant was mad at Mr. Stukey for making the sexual comment to her daughter. Ms. Fair testified that the defendant told her that on the mountain, he could not find the keys to Mr. Stukey's truck but that if he had, he planned to take Mr. Stukey to a crack house in Kingsport to make it appear as if he had been killed by drug dealers. She said the defendant told her that he did not chase Mr. Brown down the mountain because he was out of bullets.

Jennifer Gibson, the defendant's niece, testified that on August 11, Mr. Stukey was outside her house in his truck, waiting for the defendant. She said Mr. Stukey asked her "for a piece of ass" and asked her to meet him that night at 8:30. She said the comment scared her because she had been raped twice before, though not by Mr. Stukey. She said she told the defendant about the comment later that day, and the defendant said he would take care of it. She testified that on August 14, the defendant left with Mr. Brown and Mr. Stukey. She said that when the defendant returned, he told her that he had shot Mr. Stukey in the back and killed him because of what Mr. Stukey had said to her.

Eric Alford, a Unicoi County Deputy Sheriff, testified that on August 18, 1997, the defendant initiated a conversation with him following a court hearing. He said the defendant wanted to file a motion to contest the autopsy

because the autopsy report was wrong regarding where Mr. Stukey was shot. Deputy Alford testified that the defendant told him that he shot Mr. Stukey "side by side on the shoulder blade" and that he should know because "he shot the motherf***er." Deputy Alford said the defendant stated that Mr. Stukey had messed with his niece and that a child molester was the worst kind of criminal. He said the defendant stated that he was raised around violence and that when someone messes with him, his first instinct is to kill them. He said the defendant stated, "if it happened to your niece you'd . . . put a bullet in their head."

*State v. Conley Ross Fair*, No. 03C01-9810-CR-00362, slip op. at 2-8 (Tenn. Crim. App. Nov. 19, 1999).

In 2002, the Petitioner filed a pro se petition for post-conviction relief contending that he received the ineffective assistance of counsel because counsel failed to inform him that his convictions were affirmed by this court on appeal, failed to withdraw properly as counsel, and failed to apply for permission to appeal to the Tennessee Supreme Court. *See Conley R. Fair v. State*, No. E2003-00807-CCA-R3-PC, slip op. at 1-2 (Tenn. Crim. App. Mar. 1, 2004). The post-conviction court summarily dismissed the petition on the ground that the petition was untimely, and this court reversed and remanded the case for the appointment of counsel and an evidentiary hearing to determine whether due process required tolling of the statute of limitations. *Id*., slip op. at 1. Upon remand, the post-conviction court granted the Petitioner relief by permitting him to file an application for permission to appeal this court's affirming his convictions. The supreme court denied the Petitioner's application for permission to appeal. The Petitioner has filed the present petition for post-conviction relief, alleging that he received the ineffective assistance of counsel, that he was denied his constitutional right to confront witnesses, and that the evidence is insufficient to support his first degree murder conviction.

At the post-conviction hearing, the Petitioner testified that Mr. Brown gave three statements to the police before the trial and that the statements were contradictory. He thought Mr. Brown spoke to Investigator Ron Arnold and to Tennessee Bureau of Investigation (TBI) agents. At the trial, counsel attempted to introduce Mr. Brown's statements, but the trial court excluded them. The Petitioner denied counsel interviewed Mr. Brown before Mr. Brown's death but said he "couldn't really say, but I'm pretty sure it would have" changed the outcome of the trial.

The Petitioner testified that he asked counsel to interview Nikkie Christian, who was Mr. Stukey's girlfriend, and Michael Head, each of whom could have testified about the victims' propensities for violence. Ms. Christian told the Petitioner before the shooting that

Mr. Stukey would "do something" to the Petitioner if Mr. Stukey saw the Petitioner because Mr. Stukey believed the Petitioner stole $500 from him. Mr. Head met Mr. Stukey when they were confined together in jail after Mr. Stukey was arrested for theft. Mr. Stukey told Mr. Head that the Petitioner stole $500 from him, that the Petitioner "signed a statement against" Mr. Stukey in a theft case, and that Mr. Stukey was going to kill the Petitioner. The Petitioner believed the testimony of Ms. Christian and Mr. Head would have changed the outcome of his trial.

The Petitioner testified that at the time of the trial, he wanted to testify but that counsel advised him that testifying was not in his best interest because of his previous convictions. He claimed counsel told the trial court he decided not to testify, although he never told counsel he did not want to testify. He denied telling the court that he did not want to testify. Regarding the pathologist's trial testimony, the Petitioner realized the doctor's testimony that Mr. Stukey was paralyzed from the first gunshot was incorrect. The Petitioner told counsel, who called for a recess, and when the trial resumed, the pathologist was permitted to correct his statement. The Petitioner thought counsel should have cross-examined the pathologist about the erroneous statement.

The Petitioner testified that counsel failed to present prior inconsistent statements of the Petitioner's brother and sister-in-law, who each testified at the trial. He claimed his sister-in-law was lying because she was threatened with having her children taken from her. The Petitioner noted that counsel requested a mistrial during the second trial on the basis counsel was incompetent because he had never tried a first degree murder case.[1] He denied counsel filed a motion to prevent the second trial based on principles of double jeopardy.

On cross-examination, the Petitioner testified that Mr. Brown said the Petitioner fired the gun nine times, even though the revolver used held only six bullets. He said one of Mr. Brown's statements claimed the Petitioner led the men "down a path." Another statement claimed that Mr. Stukey "was in front" of the Petitioner and that the Petitioner first shot Mr. Stukey in the back. He wanted counsel to impeach Mr. Brown's testimony with evidence of his heroin addiction and having "escaped from the rehab center" the day of the shooting, but "they" would not permit the defense to use the information.

---

[1] We note that the Petitioner's first trial ended in a mistrial. Although the Petitioner testified at the post-conviction hearing that the mistrial was granted after his sister-in-law mentioned Mr. Stukey's criminal history, the post-conviction court clarified that the mistrial was granted after she mentioned the Petitioner's criminal history. The Petitioner's complaints focus on the second trial.

The Petitioner testified that he gave counsel contact information for Ms. Christian and Mr. Head but claimed he only knew Ms. Christian lived in Kingsport. He gave counsel his brother's "information" because his brother worked with Mr. Head. The witnesses were not present at the post-conviction hearing. Regarding his not testifying at the trial, the Petitioner denied agreeing with counsel that it was not in his best interest to testify. The Petitioner had "a lengthy past criminal history" of burglaries and felony theft. He said the State's witnesses also had previous convictions, but "I just couldn't bring those up, or [counsel] didn't bring theirs up."

On redirect examination, the Petitioner testified that he and Mr. Stukey were cellmates in the penitentiary before the shooting. He said that during the second trial, counsel told the Petitioner that counsel was told "that he'd never have another case in the four surrounding counties if he fought [the Petitioner's] case." The Petitioner wanted another attorney, and counsel requested permission to "dismiss himself," which the trial judge denied.

The Petitioner testified that counsel did not ask Jerry Fair, his brother, questions about the Petitioner's avoiding the victims when they came to the Petitioner's house. The Petitioner sent his nephew to the door to send away the victims, who wanted the Petitioner to "go riding around." The Petitioner said he avoided the victims because he heard the victims were "going to do something" to him. He wanted counsel to present this evidence at the trial. He agreed, though, his sister-in-law testified that he avoided the victims because he heard "Mr. Stukey was going to . . . do bodily harm" to him.

The Petitioner testified that he met with counsel twice before the first trial, that the second meeting was the day of the first trial, and that they met about four times between the two trials. At their last meeting, counsel attempted to persuade him to accept the State's plea offer of life imprisonment plus thirty years. The Petitioner rejected the offer and wanted an offer that would permit him to see "the streets" and his children grow up.

The Petitioner testified that at the second trial, the pathologist testified that Mr. Stukey was paralyzed immediately upon being shot. He stated he wanted counsel to question the pathologist about the police moving the victim's body before the pathologist examined it. The victim's body was carried "down the mountain to the coroner." The Petitioner also wanted the pathologist questioned about the pathologist's burning the victim's clothing, which would have provided evidence about the gunshot wounds. The Petitioner disputed the pathologist's testimony regarding the location of the gunshot wounds on the victim's body and said he knew where he shot Mr. Stukey. Although an autopsy report was created, the Petitioner claimed nothing in the record depicted the entry and exit wounds. He denied reviewing the autopsy report with counsel before the trial and denied knowing the substance of the pathologist's testimony until the pathologist testified at the trial. He asked counsel to

show the jury the photographs of the victim's body depicting the locations of the wounds, but counsel refused. He said the only photographs of the victim shown to the jury depicted the crime scene and maggots on the victim's body. He denied shooting the victim in the back as the pathologist testified and said he shot the victim in the right shoulder and just below the sternum.

Counsel testified that he had practiced law for about thirty years, that he had previous experience as a public defender, and that he represented the Petitioner in both trials. He attempted to introduce statements at the trial in which Mr. Brown provided information that was inconsistent with his preliminary hearing testimony. A recording of Mr. Brown's preliminary hearing testimony was played for the jury because Mr. Brown died before the trial. The trial judge denied his request, although counsel thought he followed the proper procedure for admitting the statements. Counsel recalled Mr. Brown provided inconsistent information regarding the gun used in the shooting and possibly the number of rounds fired. He wanted to discredit Mr. Brown's preliminary hearing testimony by highlighting the inconsistencies. Although he could not recall if a formal offer of proof was made to the trial court, he said he followed the procedure for admitting prior inconsistent statements through other witnesses. He also raised the issue on appeal.

Regarding the witnesses the Petitioner wanted counsel to call at the trial, specifically Ms. Christian and Mr. Head, counsel testified that he unsuccessfully attempted "to find someone," although he did not remember who. Regarding the Petitioner's right to testify, counsel said he advised the Petitioner not to testify because of his extensive criminal history. Likewise, when the Petitioner was arrested, the police found a note containing "certain statements that . . . could have [been] used against him." The Petitioner also made statements about what occurred during the shooting to the officer guarding him at the courthouse before the second trial began. Counsel noted the prosecutor called the officer as a witness, who testified that the Petitioner said, "[if] it would have happened to your niece[,] you'd put a bullet in their head, too." Counsel was concerned about the Petitioner's answering questions on cross-examination, and he denied telling the Petitioner that he was not going to testify. Counsel only advised the Petitioner that testifying was not in his best interest.

On cross-examination, counsel testified he believed that the admission of Mr. Brown's prior inconsistent statement regarding the type of gun used during the shooting would have "made a difference" in the outcome of the trial. He agreed it would have been beneficial for Mr. Brown's prior inconsistent statements to have been included in the trial transcript. Regarding Ms. Christian and Mr. Head, counsel testified that the Petitioner only said the potential witnesses were in Kingsport, Tennessee. He could not recall because of the passage of time whether the Petitioner told him what the witnesses might have said at the trial.

Counsel testified that he could not recall whether he or the Petitioner told the trial court that the Petitioner was not going to testify. He admitted the defense strategy was to show that Mr. Stukey turned on the Petitioner and that the Petitioner acted in self-defense. He said the defense "went down the tubes" when he was not permitted to introduce Mr. Brown's prior inconsistent statements, namely that Mr. Brown said the firearm was a semi-automatic handgun rather than a revolver. He noted the defense suffered, too, by the Petitioner's sister-in-law's testifying that Mr. Stukey "made certain advances toward" the Petitioner's niece, that the Petitioner was "a little upset with Mr. Stukey," that "it all came out on the mountain," and that the Petitioner attacked Mr. Stukey.

The Petitioner testified on rebuttal that the State's theory of the case was that he killed Mr. Stukey because Mr. Stukey "ra[n] his hands down" the pants of the Petitioner's thirteen-year-old niece and "asked her for sex." Mr. Stukey was thirty-eight. He said, though, his theory was that he acted in self-defense because Mr. Stukey was upset with him for being jailed for the theft of a four-wheeler and the Petitioner's spending $500 belonging to Mr. Stukey to buy a car. Mr. Head told the Petitioner that Mr. Stukey told people that Mr. Stukey would be the last person the Petitioner "told on," which the Petitioner perceived as a threat upon his life. The Petitioner denied Mr. Stukey explicitly threatened to kill him.

The Petitioner testified that he and Mr. Stukey talked the day after the incident involving the Petitioner's niece and resolved their differences, although the Petitioner did not want Mr. Stukey at his home or around his niece. The Petitioner and Mr. Stukey had "a few beers a few times" after they talked. He said the shooting occurred after Mr. Stukey came to his house, told the Petitioner about finding "some pot plants," and asked if the Petitioner wanted to help "get" the plants. The Petitioner was "pretty sure" he told counsel this version of the events.

On cross-examination, the Petitioner testified that he and Mr. Stukey "moved past" the incident with the Petitioner's niece. He denied the shooting occurred three or four days after the incident involving his niece. He said the incident involving his niece occurred one month before the shooting. Regarding the Petitioner's sister-in-law's trial testimony that he said he was "going to get Mr. Stukey" for what he did to his niece, the Petitioner said he confronted Mr. Stukey the day after the incident with a baseball bat. He denied going there to kill him but wanted to "beat his brains out." He denied telling his niece he "did it" the day after the shooting. He said the shooting was self-defense, not vengeance for what happened with his niece.

Upon questioning by the post-conviction court, the Petitioner testified that he was not claiming he acted in self-defense because of the incident with his niece or because of Mr. Stukey's threats against the Petitioner. He said he acted in self-defense because of what

-11-

occurred "when we [were] walking down the path." Regarding his testifying at the trial, he said he told counsel he wanted to testify, although he denied telling that to the trial judge.

The post-conviction court denied relief. Regarding all of the Petitioner's claims except ineffective assistance, the court found that the claims "contain[ed] only statements or conclusions and [did] not state sufficient facts to support the conclusions and [did] not provide a proper basis for . . . Post-Conviction Relief." The court found that the Petitioner presented no evidence to support his statements and conclusions, that the issues were litigated in the appeal of his convictions, and that the issues were without merit.

Regarding the Petitioner's claim that counsel provided the ineffective assistance of counsel by failing to make an offer of proof relative to Mr. Brown's prior inconsistent statements, the post-conviction court found that counsel unsuccessfully argued for the admission of Mr. Brown's previous statements and that counsel was not deficient in this regard. The court, though, found counsel was deficient by failing to make an offer of proof at the trial because, in part, the failure to make an offer of proof prevented this court's review of the trial court's findings.

After reviewing the trial transcript and the testimony at the post-conviction hearing, the post-conviction court found that the prior inconsistent statements involved Mr. Brown's being mistaken about whether the gun used in the shooting was a revolver or a semi-automatic handgun, information about the location of the parties at the time of the shooting, and Mr. Brown's heroin addiction. Although the court found that whether Mr. Brown was an addict could only have been used for impeachment purposes, the court found that the remaining statements "may possess some information to impeach" Mr. Brown's credibility but would not have "overcome the other evidence of the [Petitioner's] guilt." The court found that the absence of an offer of proof did not create a reasonable probability that the outcome of the proceedings would have been different. The court noted the trial testimony showing that the Petitioner "let it be known that he intended to seek revenge" for Mr. Stukey's conduct against the Petitioner's niece. The court found that the evidence at the trial showed that the Petitioner had a "detailed plan to lure" Mr. Stukey to the location of the killing and that Mr. Brown was "in the wrong place at the wrong time." The court, likewise, found that the Petitioner brought the gun to the scene, that he admitted at the post-conviction hearing that he shot Mr. Stukey twice and shot at Mr. Brown, and that he made multiple incriminating statements after the shooting.

Regarding the Petitioner's claim that counsel was ineffective by failing to present Ms. Christian and Mr. Head to show that the victims were the first aggressors to support his self-defense theory, the post-conviction court found that the Petitioner only provided counsel with the witnesses's names and told counsel Ms. Christian lived in Kingsport. The court noted

-12-

that after the first trial ended in a mistrial, the Petitioner failed to provide counsel with updated information on the witnesses's whereabouts.

Regarding the Petitioner's claim that counsel was ineffective by failing to show the trial court that he waived his right to testify, the post-conviction court found that the trial transcript failed to show the Petitioner waived his right to testify on the record or in writing. The post-conviction judge, however, found that the issue was not a question for him to consider. The court noted that counsel and the Petitioner testified at the hearing that they met and had "detailed conversations" about whether the Petitioner should testify. The court stated it was undisputed that counsel advised the Petitioner not to testify because of his previous criminal history and because of the multiple incriminating statements he made about the shooting. Although the court noted that placing on the record the Petitioner's decision to testify would have "shielded" counsel from an ineffective assistance claim, the court found that the Petitioner was not prejudiced by counsel's failure because of the overwhelming evidence of the Petitioner's guilt. This appeal followed.

A post-conviction petitioner has the burden of proving his factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f) (2012). A trial court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A trial court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58. Post-conviction relief is appropriate when a conviction or sentence is void or voidable because of a violation of a constitutional right. T.C.A. § 40-30-103 (2012).

**I**

The Petitioner contends that the post-conviction court erred by failing to make findings of fact and conclusions of law regarding his claim that he was denied his right to confront witnesses. He argues that he was denied his right to present evidence of Mr. Brown's prior inconsistent statements at the trial. The State initially responds that this issue was previously litigated in the appeal of the Petitioner's convictions and that he is not entitled to raise the issue in his petition for post-conviction relief. Alternatively, the State argues that the post-conviction court properly denied relief because the Petitioner failed to prove his contention by clear and convincing evidence. We conclude that the Petitioner is not entitled to relief.

The post-conviction court addressed all of the Petitioner's allegations collectively, except for the ineffective assistance claim. The post-conviction judge did not address the confrontation issue individually, but he found that the Petitioner failed to present evidence to support his contention that his confrontation rights were violated. The Petitioner argued in his petition that his confrontation rights were denied because his convictions were "based on prejudicial prior inconsistent statements that could not be effectively impeached or cross-examined[.]" As the court properly noted in collectively addressing the Petitioner's claims, the Petitioner failed to present evidence regarding his confrontation rights. The record shows that neither the Petitioner nor his counsel mentioned confrontation rights at the post-conviction hearing. "A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient" for post-conviction relief. T.C.A. § 40-30-106(d) (2012).

Evidence regarding Mr. Brown's prior inconsistent statements was presented in the context of the Petitioner's ineffective assistance claim, not the confrontation context. Likewise, the Petitioner failed to produce at the post-conviction hearing Mr. Brown's alleged prior inconsistent statements to the police, although he testified that Mr. Brown's inconsistent statements focused on the type of firearm used during the shooting and where the parties were located at the time of the shooting. Although the trial transcript was admitted as an exhibit and included in the appellate record, the substance of Mr. Brown's previous police statements are not included in the record. As a result, the Petitioner cannot show by clear and convincing evidence that his confrontation rights were violated or that any violation affected the outcome of the trial. We note the post-conviction court properly found that the proof of the Petitioner's guilt was overwhelming. The evidence at the trial showed that Mr. Stukey made sexual advances toward the Petitioner's young niece, that the Petitioner lured Mr. Stukey to the location of the shooting and shot him multiple times, and that the Petitioner shot at Mr. Brown. Several witnesses at the trial testified regarding statements the Petitioner made before and after the shooting about his punishing Mr. Stukey for the incident involving his niece.

In any event, the Petitioner previously litigated this issue in the appeal of his convictions. In the previous appeal, the Petitioner contended that the trial court erred by "not allowing him to introduce evidence of a prior inconsistent statement[s] made by Mr. Brown to TBI Agent Shannon Morton." *Conley Ross Fair*, slip op. at 9. He argued that the trial court's refusal to admit the prior inconsistent statements "unfairly infringed upon his right to confrontation." *Id.* This court concluded that "if the alleged statement[s] [are] a prior inconsistent statement, the trial court erred by not admitting it. . . . Nevertheless, we are constrained to conclude the error was harmless" because the Petitioner failed to show that the statements were in fact inconsistent with Mr. Brown's preliminary hearing testimony or that the trial court's ruling affected the outcome of the trial. *Id.*, slip op. at 10; *see* T.C.A.

-14-

§ 40-30-106(h) (2012) (stating that "[a] ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing"). The Petitioner is not entitled to relief on this basis.

**II**

The Petitioner contends that the post-conviction court erred by concluding that counsel did not provide the ineffective assistance of counsel. He argues counsel was ineffective by failing to make an offer of proof regarding Mr. Brown's prior inconsistent statements, by failing to present Ms. Christian and Mr. Head as witnesses, and by failing to place on the record whether the Petitioner intended to testify at the second trial. The State responds that the post-conviction court properly denied relief. We agree with the State.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). To establish the performance prong, a petitioner must identify counsel's acts or omissions that "are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. The court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Id*. To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

Regarding counsel's failure to make an offer of proof regarding Mr. Brown's prior inconsistent statements, the record shows that although counsel unsuccessfully attempted to present evidence of Mr. Brown's alleged prior inconsistent statements, counsel failed to make an offer of proof regarding the substance of Mr. Brown's statements that were given to the police before the preliminary hearing in this case. The post-conviction court properly found that counsel was deficient in this regard.

The Petitioner, however, has failed to show that counsel's deficient performance prejudiced the outcome of the trial or the appeal of his conviction. Although the Petitioner testified about Mr. Brown's alleged prior inconsistent statements focusing on the type of handgun used and the location of the parties when the shooting began, he presented no police reports or documentation regarding the relevant statements. In any event, the post-conviction court properly found that overwhelming evidence of the Petitioner's guilt was presented at the trial. We note that in the appeal of the Petitioner's convictions, this court concluded that the evidence was sufficient to support his convictions based in large part on the testimony of the Petitioner's niece and sister-in-law, who testified that the Petitioner admitted killing Mr. Stukey and shooting at Mr. Brown after confronting Mr. Stukey about his sexual advances toward the Petitioner's niece. We note, too, that the Petitioner told his sister-in-law how the shooting occurred and that the Petitioner made additional incriminating statements about his reasons for killing Mr. Stukey. The record fails to show that an offer of proof would have changed the outcome of the trial or the appeal.

Regarding counsel's failure to present Ms. Christian and Mr. Head at the trial, the record shows the Petitioner believed the witnesses would have testified regarding Mr. Stukey's violent nature and Mr. Stukey's threats to harm the Petitioner for a dispute over $500 and for talking to the police about a theft of which Mr. Stukey was accused. The record shows that the Petitioner told counsel to speak with Ms. Christian and Mr. Head about Mr. Stukey's anger for the Petitioner and threatening to harm the Petitioner. Counsel testified that the only contact information provided by the Petitioner was that Ms. Christian lived in Kingsport, Tennessee. Counsel unsuccessfully attempted to find potential witnesses identified by the Petitioner, although he did not recall who. We cannot conclude based on the record before us that counsel was deficient in his attempts to locate the potential witnesses.

We note that the Petitioner failed to present Ms. Christian and Mr. Head at the post-conviction hearing. This court has concluded that when a petitioner claims counsel was ineffective by failing to call a witness at a trial, a petitioner generally cannot establish prejudice without presenting that witness at the post-conviction hearing. *Black v. State*, 794 S.W.2d 752, 757-58 (Tenn. Crim. App. 1990) (concluding that a post-conviction petitioner should produce a material witness "who (a) could have been found by a reasonable investigation and (b) would have testified favorably in support of his defense if called" to establish his claim). The Petitioner is not entitled to relief on this basis.

Regarding counsel's failure to place on the record whether the Petitioner intended to testify at the second trial, the record shows that the Petitioner did not waive in writing his right to testify or discuss on the record with counsel or the trial court about whether he wanted to testify on his own behalf. *See Momon v. State*, 18 S.W.3d 152, 161-62 (Tenn.

1999) (stating that the right to testify is a fundamental right and may "only be waived personally by the defendant" and that a fundamental right "may only be waived if there is evidence in the record demonstrating an intentional relinquishment . . . of a known right" (internal quotations and citations omitted)). In *Momon*, our supreme court concluded for the first time that a defendant's right to testify is fundamental and requires waiver on the record or in writing. *Id*. The Petitioner's trial occurred in 1997, two years before *Momon* was decided. The requirements pursuant to *Momon* were not in effect at the time of the Petitioner's trial, and he does not argue in this appeal that the obligations pursuant to *Momon* retroactively apply. *See id.* at 162-63 (stating "that neither the right to testify . . . , nor the procedural protections adopted to preserve that right are new constitutional rules which must be retroactively applied"). As a result, the *Momon* requirements do not apply to the Petitioner. *See Kenneth Antony v. State*, No. M2003-02272-CCA-R3-PC, slip op. at 7, n.3 (Tenn. Crim. App. Aug. 11, 2004). The critical inquiry is whether counsel adequately advised the Petitioner of his right to testify and whether the Petitioner made an informed decision. *See Andrew Lee Moats v. State*, No. E2003-00402-CCA-R3-PC, slip op. at 8 (Tenn. Crim. App. Oct. 9, 2003), *perm. app. denied* (Tenn. Jan. 26, 2004) (stating in a pre-*Momon* case that the issue is whether the evidence shows that the petitioner made the decision whether to testify after being advised by counsel or whether counsel made a unilateral decision not to call the petitioner as a witness).

The undisputed evidence at the post-conviction hearing showed that the Petitioner and counsel discussed whether the Petitioner should testify at the trial and that counsel advised the Petitioner against testifying because of his lengthy criminal history and because of the multiple incriminating statements he made before and after his arrest. Counsel testified that although he advised the Petitioner against testifying, he only provided the Petitioner with advice and that the decision belonged to the Petitioner. Counsel denied telling the Petitioner that the Petitioner was not going to testify and said he only advised the Petitioner that testifying was not in his best interest. We cannot conclude that counsel provided deficient performance. We note that had the Petitioner testified at the trial, he likely would have been cross-examined about his previous convictions and about the numerous incriminating statements he made about why the shooting occurred. The record does not preponderate against the post-conviction court's findings, and the Petitioner is not entitled to relief on this basis.

The judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE